Good morning, Your Honors. And may it please the Court, my name is Jonathan Amanoff on behalf of Petitioner Appellant Shondel Lamar Larkin. Your Honors, in the present case, the DNA report was the one objective piece of evidence that put Mr. Larkin at the scene of the crime. The DNA report is a written, 100-page document, initialed on each page by the analyst, Jason Bethis, and the supervisor, Jason Kokuzaka. These are formal statements made to the Los Angeles Police Department at the request of the Los Angeles Police Department for the primary purpose of establishing that Mr. Larkin committed the crime in question. Mr. Larkin, why shouldn't we sit tight on this case and see what the Supreme Court does in Bull Cunning? Your Honor, my view on that is that this is – because this is a habeas case, we're governed strictly by what the state of the law was at the time the conviction became public. Well, I don't know. What if the Supreme Court were to say in Bull Cunning, as it did in Melendez-Diaz, that whatever its answer is simply a straightforward application of Crawford? Because if it is, then arguably that's what the law was at the time. That's true. I think the Court's already made that position clear in Melendez-Diaz, and I think we're quite clearly covered by Melendez-Diaz. And so I don't think there's any need to wait for that decision. Well, Melendez-Diaz – neither Melendez-Diaz, Crawford, nor Davis deals with a situation where a – someone who is a supervisor, basically, offers an opinion based upon data produced by other people. I mean, it just hasn't been dealt with yet. Yeah. I mean, I think we can look at the decisions following Melendez-Diaz, such as Barber v. California and Cragar v. Ohio, which deal specifically with that issue. Well, then we're really getting beyond what was clearly established law at the time. But those decisions were cited – were decided on only with a citation to Melendez-Diaz. And as Melendez-Diaz very explicitly says, as Your Honor has pointed out, it's just a decision under Crawford and Davis. So any decisions following Melendez-Diaz was only a citation to that. Okay. Well, I mean, again, and looking back specifically at Melendez-Diaz, I mean, looking at this Thomas concurrence that's been somewhat controversial, it's very clear in Thomas's concurrence that he's not limiting his opinion just to affidavits, but rather to formalized testimonial materials, such as the report in this case. I think under the definitions put forth by Crawford and Davis, the report is quite plainly a formalized testimony material. Was the report offered as an exhibit? No. The report was not offered. It didn't come in affirmatively as evidence. There were parts of the report that were offered by the defense. That's right. The defense did blow up the results of the profiler plus test and the co-filer test. But the government did not offer it. The government did not offer it. But the woman who testified, Dr. Ward, relied solely on that report for her conclusions and for the statistical calculations that were contained therein. Doesn't this case differ from Melendez-Diaz? Your Honor, I don't think it does. What was offered in Melendez-Diaz? Those were affidavits from drug testers. Was anything like that offered here, an affidavit? It wasn't an affidavit. Or a certification? It wasn't an affidavit or a certification, but it was a formal testimonial material, which is what Thomas limits his concurrence to. And formalized testimony materials are defined quite clearly in Crawford and Davis, and would, under those definitions, include this report. Well, would was there to be cross-examined. What would she have asked the actual testers? Well, I mean, would was there to be cross-examined. Dr. Ward was there to be cross-examined. Ward, sorry. I'm sorry. No, that's perfectly true. But she had no knowledge of the actual testing that was done, and she couldn't say with any specificity what actually happened during this testing. And, you know, as was explained at the beginning of the trial. Yeah, well, that just makes testimony not worth very much. But that doesn't show that there was a hearsay issue or a confrontation clause issue. Well, I think it does. The fact that she couldn't speak specifically to the testing that was done denied the defense an opportunity for effective cross-examination, which is what the Supreme Court has said the Sixth Amendment guarantees. Well, cross-examination, I thought, was very effective. She indicated that this was a very weak conclusion. She indicated this was weak DNA evidence in comparison to very strong. And that came out through cross-examination. That did come out through cross-examination. But she wasn't ultimately the conclusion of this whole thing was that this DNA evidence was actually the most powerful evidence against Mr. Larkin. Counsel, that's the way that you began your statement. And I'm a little puzzled by that statement because the California Court of Appeal and the magistrate and the district court found that there was a palm print inside the windowsill. That's correct. Is that inside the apartment or outside the apartment? That is inside the windowsill. Okay. How did the palm print get inside her apartment? Well, I mean, that's certainly the question. And I think the evidence that came out at trial was that the people who testified to the palm print were not certified fingerprint analysts. They didn't work at a certified fingerprint lab. But you're not challenging that on Melendez grounds, are you? No. Okay. So that simply goes to the weight of the evidence which was found against you by the jury. Well, we don't know exactly what the jury said about that fingerprint evidence. We know the jury convicted. But we have a palm print inside the apartment. We do. And your initial statement was the DNA evidence was the only thing putting him inside the apartment. Maybe I misspoke. What I meant to say was the only objective piece of evidence. The only objective evidence. And why is the palm print objective evidence? Well, the defense expert, Dr. Cole, testified that fingerprint evidence is not as purely subjective, meaning you could have two fully qualified fingerprint experts speaking about fingerprints and reach totally different opinions. And, I mean, you wouldn't have that with DNA. But the jury heard that testimony. They did hear that testimony. And they also heard the DNA. I'm sorry. And they also heard the fingerprint. And the jury believed that he was guilty. The jury believes he was guilty. And they heard both sides. They did. On whether this was a palm print that they should consider. They did. And they did hear the DNA evidence. And as the district attorney said in his closing argument, you can essentially disbelieve anything. The only purely unreasonable thing here is how did his watch end up in her room. And, as he said, it's the physical evidence that does not lie. It's the DNA evidence, ultimately, that ties everything together. He spoke of the DNA as the one piece of corroborating evidence. And I think I included citations of that in the briefing. But that's throughout his closing argument and his rebuttal and also in his opening statement. I'm still a little puzzled, though, because the DNA evidence, as Dr. Word admitted, was fairly weak. The DNA doesn't confirm that the watch was his. It only suggests that he can't be excluded from the group of potential owners of the watch. That's a very different proposition. I assume that you made as much of that as you possibly could. Well, DNA evidence can never affirmatively say it belongs to someone. Right. But this wasn't even a particularly narrow case. This was a fairly broad class of DNA owners. It was one in 12,000. Yeah. And, I mean, that to me sounds pretty strong. And, I mean, again, the testimony wasn't, and as the DA pointed out in his closing argument, this wasn't weak evidence. This was weak DNA evidence in comparison to the universe of DNA evidence where you can say one out of billions and billions of people. You have an ID by the victim as well, an in-court ID. We have an in-court ID. She wasn't able to identify Mr. Larkin at the six-pack lineup. She drew a picture of her attacker soon after the attack that does not resemble Mr. Larkin. She stated on the witness stand that she called the police the next day after the six-pack lineup to tell them that she could identify him. Both police said that never happened. She wrote in her personal journal that she couldn't visualize the defendant. I mean, we know that the next-door neighbor identified him. We know he was featured prominently in various television commercials, and the eyewitness expert testified this is a perfectly reasonable explanation why she would identify him. The jury heard all of this. They did. The jury did. Aren't you asking us to re-weigh what the jury considered? No, I'm asking you to consider the prejudicial effect of the DNA testimony. And looking at the rest of this. You were talking about the identification. Right. What I'm saying is if you take away the DNA, the rest of this evidence is not strong. The jury ultimately relied on the DNA evidence, as the district attorney told them to. He said to them, look, this DNA corroborates everything. How do we know what the jury relied upon? I mean, I think we can make certain reasonable inferences from the fact the jury acquitted on the charge involving the neighbor, Robin. In that case, the evidence against him was a much stronger eyewitness identification and the prior acts, and the jury acquitted. The difference between the Lori attack is significantly less strong eyewitness identification, the same prior acts, the fingerprints, and the DNA. As Your Honor just pointed out, a lot of evidence came in that the eyewitness identification wasn't reliable if the fingerprints weren't reliable. You can't convict someone on prior acts that don't resemble this crime in the slightest. So what we're left with is the DNA evidence. And as I think this Court pointed out in Arles v. Rinells, when a prosecutor relies on a constitutional error in both opening and closing, it's difficult to say that that error couldn't have had a substantial and injurious effect. Thank you, Mr. Amanoff, and your time has expired. Thank you. May it please the Court. Deputy Attorney General Yan Lee for respondent. The California Court of Appeal here cannot be said to have unreasonably applied, clearly established federal law, as there was no Supreme Court precedent on whether an expert's testimony as to her own opinions and conclusions based in part on test results performed by another analyst constitutes testimonial hearsay. At the time the conviction became final, when the Court of Appeal issued their opinion, Crawford and Davis had already been decided. Melendez-Diaz came out after the magistrate issued the R&R. The mere fact that the majority in the Melendez-Diaz case considered that opinion to be a straightforward application of Crawford does not indicate that it was. In fact, the four dissenting justices in Melendez-Diaz believed that it was not a straightforward application of Crawford. And there were many courts, state and federal, which also disagreed with how the scientific evidence should be addressed in terms of Crawford in the Confrontation Clause context. What is your view as to whether we should wait for Bullcoming or not? I think the fact that the Supreme Court granted certain Bullcoming also helps our position that there was no Supreme Court precedent that was clearly established at the time of our case. The facts in Bullcoming are a lot closer to the facts in our case, as opposed to the facts that were in Melendez-Diaz, as Your Honor had pointed out. So I think that the fact that it does show, and the fact that Bullcoming, when decided, will be way after our case became final, that it would really have no relevance in terms of whether that law was clearly established at the time of our case. Even if it were to hold that it's a straightforward application of Crawford? Our position is that Melendez-Diaz is not a straightforward application of Crawford. The legal landscape at the time shows that there were various divergent treatments as to how to approach this type of evidence, whether it's forensic evidence in terms of reports that were admitted, or whether it was expert testimony that was based in part on forensic evidence, such as reports. Based on that alone, Melendez-Diaz is not a straightforward application. Bullcoming, which will be coming out after our argument, cannot be considered clearly established. Assuming Your Honors disagree with our position that Melendez-Diaz is a clearly established law of Crawford, and clearly, excuse me, that Melendez-Diaz is a straightforward application of Crawford, and that Bullcoming also decides that it's a straightforward application of Crawford, then we would ask that you would wait for the decision in Supreme Court. But our first argument is that it really has to be... Didn't the court say that Melendez-Diaz was not new law, that it was an application of Crawford? The district court? The Supreme Court. The Supreme Court stated that... In Melendez-Diaz. That it is not a new law. That was applying Crawford. Although the Supreme Court did say that, in determining whether a law is clearly established, you're looking at not only what that opinion says, but also conflicting opinions in cases at the time. In this case, there were four dissenting justices that believed that Melendez-Diaz was overturning nine years of jurisprudence on this particular issue, and there were also many other circuits and courts that had disagreed as to the impact of a Crawford decision on forensic evidence. Even after the Supreme Court granted cert and vacated judgment, and we amended for further proceedings in Moore and Barba and Crazer, two of those courts in Barba and Moore, on remand, decided the same, that Melendez-Diaz was not applicable in their case, and found that the evidence was not testimonial. And also the fact that the Supreme Court did grant, did a JVR order on those three cases, does not show that Melendez-Diaz was limited to affidavits, as petitioner claims. The JVR order simply alerts the lower courts of a new legal finding or legal issue that the court might not have overlooked. And also it allows the lower courts to make a determination on the merits, which would be helpful to the Supreme Court later on. So in this case, in those three cases, not only were the experts testified, but the reports in question were also admitted into evidence. So in that instance, it is similar to the affidavits that were admitted in Melendez-Diaz. In Peeble v. Geyer, where there was no report admitted into evidence, the Supreme Court did not grant cert in that case, which would also help our position that Melendez-Diaz is limited to affidavits where they were actually admitted into evidence. In our case, the testimony at issue is not the report, that 100-page report that was not admitted into evidence. The testimony at issue is Dr. Ward's testimony, her expert opinion testimony, based on the raw data of the results generated by the machine that tested the samples. Based on her experience, her training, her knowledge in the area, she came up with her own conclusions, her own opinions as to what that data meant. And in this case, the data showed that a petitioner could not be excluded as a donor of the DNA in the watch. The watch was found in her bedroom, but the DNA evidence showed that there were at least three, if not more, contributors of sources of DNA on that watch. As to the African-American population, the DNA test showed that there were one out of 12,000 African-American population in terms of the frequency. In L.A. County alone, I believe there are close to 10 million people in L.A. County, and I think African-American population is close to 10%. That place is not petitioner in the bedroom of Lori, but also more than petitioner, I would say, in her bedroom. Not only that, the physical evidence that the district attorney emphasized in this case was not the DNA evidence, which Dr. Ward admitted was very, very, very weak and very low, that they had difficulty obtaining enough samples, I mean enough sufficient data to generate the comparisons in this case. The physical evidence that was emphasized was the fingerprint and the palm print evidence that was found. The DA argued that in the totality of the evidence, in all the circumstances, if you look at it together, he said even if the DNA evidence is not very strong, he said you look at all the other evidence that was here, the six-pack identification testimony by Robin, also the Lori's in-court testimony, the fingerprint and the palm print evidence, which even the defense expert has stated that there were only, I believe, 0.8% error rate in terms of the analysis. There was no evidence that there were any errors in terms of the way the fingerprints were analyzed in this case. It positively identified the petitioner as the source of the fingerprint that was on her apartment door and on the inside of the windowsill. Let's assume that we disagree with you and we think Melendez-Diaz applies. Was the defendant prejudiced in this case? The defendant was not prejudiced in this case because the DNA evidence in this case could not have contributed, failed to show that it had a substantial injurious effect or influence in determining the jury's verdict. As Your Honors had mentioned before, the DNA evidence was not the one in quadrillion frequency that's normally found in terms of identification. The DNA evidence here was very weak. The prosecutor admitted it as much in the opening statement. He reiterated it in his closing argument. The DNA evidence was mentioned maybe about four pages out of 28 pages of his argument total. The evidence that was emphasized was the fingerprint and the palm print evidence. The fact that there was no explanation as to how his prints were found in Lori's apartment. Her apartment was in the upstairs of a two-unit building and her apartment was in the back of the two units. So there was no explanation as to the presence of his prints that were found. There was also the identification evidence of Robin and Lori, the victim. So based on the totality of the evidence here, the DNA evidence was not the linchpin that put the evidence over the edge that harmed Mr. Larkin. So let's do it. Thank you. Thank you for your argument. You're out of time, but your opposing counsel just ruled you about 20 seconds. Thank you. Your Honor, just in response to the opposing counsel's comment about the DA's closing argument, what the DA actually said was he didn't say all the evidence was cumulative. His exact quote was, even if you don't believe the eyewitness ID, there's the DNA. The DNA was the absolute strongest evidence in this case, and that's how the DA used it over and over again in his argument to confirm everything. I think the fact that the report in this case wasn't affirmatively admitted into evidence is irrelevant. If it's a testimonial statement, you have the right to cross-examine. The explanation of the prints was quite simply that they weren't his and that the fingerprint analysts were wrong. And I don't think there's any way to say that the Supreme Court's opinion in Melendez-Diaz wasn't saying this is a straightforward application of Crawford. Thomas doesn't make his consent to the opinion based on that in any way. Thank you. Thank you, General. The other disargument will be submitted in the next year argument, United States v. Forrest.
judges: Alarcon, Rymer, Bybee